**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| NABIL SALEH, as Trustee of the Nabil Saleh M.D. LTD Pension Plan, | ) ) ) | |
| Plaintiff, | ) ) | No. 14-CV-09186 |
| v. | ) ) | Judge John J. Tharp, Jr. |
| HASAN MERCHANT, et al., | ) ) | |
| Defendants. | ) | |

----------------------------------------------------------------------------------------------------

| | |
|---|---|
| MUSKEGAN HOTELS LLC, M.D. 1 LLC, GLOBAL DEVELOPMENT, INC., MD GLOBAL LLC and MICHAEL I. MERCHANT, as Administrator of the Estate of Hasan G. Merchant | ) ) ) ) ) ) |
| Cross-Plaintiffs, | ) ) |
| v. | ) ) |
| FEDERAL DEPOSIT INSURANCE CORP., as Receiver for The National Republic Bank of Chicago, THE STATE BANK OF TEXAS, CHANDRAKANT PATEL, ADVANCED APPRAISAL GROUP, INC., ADVANCED APPRAISAL CONSULTANTS, INC., ADVANCED APPRAISAL CONSULTANTS, LLC, WILLIAM DADDONO, HIREN PATEL, EDWARD FITZGERALD, WOLIN & ROSEN LTD. and SMITHAMUNDSEN LLC, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Cross-Defendants. | ) ) |

## MEMORANDUM OPINION AND ORDER

This is a case about hotels that, as it turns out, were not such lovely places.[1] After they were sued by disgruntled underlying investors in hotel properties that they had purchased, cross-plaintiffs Muskegan Hotels, LLC, M.D.1 LLC, Global Development, Inc., MD Global LLC, and Michael I. Merchant, as administrator of the Estate of Hasan G. Merchant, filed a cross-complaint against several financial institutions, appraisal companies, law firms, and individuals,[2] alleging that cross-defendants used fraudulent appraisals to induce them to purchase hotel properties at inflated prices that the properties could not support. According to cross-plaintiffs, principals of the now-defunct National Republic Bank of Chicago worked with other cross-defendants to devise and participate in a widespread scheme to defraud hotel purchasers and, after National Republic Bank went into receivership, the Federal Deposit Insurance Corporation (FDIC). The cross-complaint alleges violations of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1962, as well as Illinois state law claims for fraud, tortious interference with contract, negligence, breach of fiduciary duty, quantum meruit, and equitable subordination. Seven cross-defendants now move to dismiss.

---

[1] *See* THE EAGLES, HOTEL CALIFORNIA (Asylum Records 1977).

[2] Cross-defendants are Hiren Patel and Edward Fitzgerald (former principals of National Republic Bank of Chicago), William Daddono, Advanced Appraisal Group, Inc., Advanced Appraisal Consultants, Inc., Advanced Appraisals Consultants, LLC, State Bank of Texas, Chandrakant Patel (Chairman of State Bank of Texas), Wolin and Rosen Ltd., SmithAmundsen LLC, and the Federal Deposit Insurance Corporation. The Advanced Appraisal entities have not yet appeared in this litigation. All other defendants except Daddono now move to dismiss the Second Amended Cross-Complaint.

# I. BACKGROUND[3]

## A. General Allegations

In 2003, the United States Comptroller of the Currency and National Bank Examiner determined that National Republic Bank of Chicago ("NRB") had an excessive outstanding balance of loans to the hotel and motel industry. Second Amended Cross-Complaint (SACC) ¶ 16. As a result, the Treasury Department and NRB's directors, CEO Hiren Patel and President Edward Fitzgerald, entered into a consent decree designed to decrease NRB's balance of hotel/motel loans. *Id*. The consent decree required Hiren Patel and Fitzgerald to make capital injections into the bank out of their own pockets if the bank did not meet certain reduction targets. *Id*. ¶¶ 17-18.

Starting in 2003, NRB hired William Daddono and his companies (the Advanced Appraisal cross-defendants) to perform appraisals of foreclosed hotel and motel properties in NRB's possession. According to the complaint, Daddono's appraisal reports grossly overvalued the properties to match a pre-arranged target valuation set by Hiren Patel and Fitzgerald. *Id*. ¶¶ 21-22, 42. NRB in turn used the appraisals to sell its foreclosed properties and write loan packages to the purchasers. When many purchasers were inevitably unable to repay the inflated loans, NRB (and its successors, as discussed below) would file foreclosure actions and make other endeavors to collect delinquent payments.

To arrive at inflated property values, Daddono employed several questionable methodologies, including using underlying data from properties that were not comparable to the subject properties, underestimating operating expenses (including marketing, utility

---

[3] As this is a motion to dismiss, the Court accepts all well-pleaded facts as true and construes all inferences in favor of the plaintiff. *Zemeckis v. Global Credit & Collection Corp.*, 679 F.3d 632, 634 (7th Cir. 2012).

maintenance, and insurance expenses as well as franchise fees), overestimating income potential, omitting key costs and required capital expenditures, and improperly adjusting sales comparisons. *Id*. ¶ 25. A typical Daddono appraisal inflated the value of the property by 100%. *Id*. ¶ 39. Hiren Patel and Fitzgerald would then meet prospective purchasers of a hotel property, tell them that Daddono's appraisal was "good," and instruct the purchaser to sign documents purchasing the property using loans from NRB. *Id*. ¶¶ 28-30.

NRB eventually failed, and in October 2014, it was liquidated by the FDIC. Non-party TPG Capital purchased and accepted assignments of NRB's non-performing loans, which had a face value of $600 million. The State Bank of Texas purchased and accepted assignments of NRB's performing loans, with a face value of $300 million. *Id*. ¶¶ 36-37. According to the complaint, Hiren Patel and Fitzgerald planned to continue defrauding hotel purchasers through the assignment of loans to State Bank of Texas and various TPG Capital entities. *Id*. ¶¶ 43-44. From 2006 to 2017, Hiren Patel and Fitzgerald "had contacts and communications" with TPG Capital entities and officers and with Chandrakant Patel of the State Bank of Texas "to arrange continuation of the fraud scheme and profit-sharing among members" and "to arrange the transfer of illegal profits and revenue after [NRB] failed." *Id*. From 2014 to 2017, State Bank of Texas executed security agreements with lenders pledging the acquired NRB accounts as collateral, but failed to disclose to the lenders that the NRB loans were obtained by fraud. *Id*. ¶ 77. State Bank of Texas and the TPG Capital entities also filed numerous collection lawsuits based on the fraudulent loans, and State Bank of Texas transmitted false account statements and payment demands as part of its collection efforts. *Id*. ¶¶ 81, 89, 91, 92. State Bank of Texas, TPG Capital, and TPG's servicer, Capital Crossing, used Daddono's fraudulent appraisals in their collection efforts, arranged new and modified loan packages based on the fraudulent appraisals,

seized commercial properties based on a borrower's failure to repay the fraudulently inflated loans, and supervised the successful underwriting of commercial loans based on the false appraisals. *Id*. ¶ 92. State Bank of Texas, TPG Capital, and Capital Crossing also failed to report the false appraisal scheme to U.S. Treasury Department regulators, and maintained an off-the-books fund from which illegal payments to Daddono were made. *Id*. ¶ 103.

Two law firms, Wolin and Rosen and SmithAmundsen, were hired to assist with the scheme. Wolin and Rosen and SmithAmundsen sent demand letters to entities who had taken out loans from NRB based on Daddono's fraudulent appraisals. They also filed thousands of collection lawsuits in order to secure payment on the fraudulent loans. *Id*. ¶¶ 104-110.

### B.     Cross-Plaintiff Specific Allegations

Although the complaint alleges that fraud by the cross-defendants was pervasive, the allegations focus on three particular transactions. In 2006, Hiren Patel and NRB sent Muskegan Hotels and Hasan Merchant a fraudulently inflated appraisal of a hotel property in Benton Harbor, Michigan that listed the property's value at $2.34 million. In reality, the property was worth only $1.1 million. *Id*. ¶¶ 62-63. Muskegan Hotels and Merchant relied on the false appraisal in purchasing the Benton Harbor property for $2 million. *Id*. ¶ 63. Similarly, the complaint alleges that in 2007, Hiren Patel NRB presented Muskegan Hotels LLC and Hasan Merchant with fraudulent appraisals performed by Daddono of hotel properties at 3380 and 3450 Hoyt Street in Muskegon, Michigan. *Id*. ¶ 55. The appraisals noted that the 3380 Hoyt property was worth $1.45 million, and the 3450 Hoyt property was worth $11 million. In reality, the 3380 Hoyt property was worth $800,000 and the 3450 Hoyt property was worth $500,000. Muskegan Hotels and Merchant relied on the fraudulent appraisals to purchase the properties for $1,417,500 and $1,067,500, respectively. *Id*. ¶¶ 52-58. Merchant and Muskegan Hotels discovered the fraud

when Vimeshkumar N. Patel, a former friend of Hiren Patel, revealed that NRB had been under government pressure for years to rid itself of non-performing hotel loans and that NRB had been making secret payments to customers to hide foreclosed hotels from regulators. *Id*. ¶ 71.

## C.     Procedural History

In 2010, Nabil Saleh, an investor in the hotel properties purchased by cross-plaintiffs, filed suit against Hasan Merchant and fifteen other defendants, including Muskegan Hotels LLC, M.D. 1 LLC, MD Global LLC, Global Development LLC, and NRB, alleging a scheme to defraud investors in the hotel properties. *See* Dkt. 1-4. Most of the defendants named by Saleh— including every current cross-plaintiff—filed cross-claims against NRB alleging fraud, tortious interference with contract, unjust enrichment, and quantum meruit claims. *See* Dkt. 1-6. In late 2014, NRB failed and the FDIC took NRB into receivership. The FDIC removed the case to federal court pursuant to 12 U.S.C. § 1819(b)(2), after which the current cross-plaintiffs filed a new cross-complaint alleging three claims under the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1962, in addition to their Illinois state law claims. *See* Dkt. 14. The case was then stayed for several months while cross-plaintiffs pursued their claims through the FDIC's administrative process, which resulted in a denial of all claims. *See* Dkt. 26-27. In May 2017, cross-plaintiffs filed a Second Amended Cross-Complaint, the subject of the instant motions to dismiss, alleging quantum meruit claims against all counter-defendants, RICO, fraud, and tortious interference with contract claims against all counter-defendants except the FDIC, negligence and breach of fiduciary duty claims against Hiren Patel and Edward Fitzgerald, and an equitable subordination claim against the FDIC. *See* Dkt. 127. With the

exception of Daddono (who is presently incarcerated, a prisoner of his own device[4]) and the

Advanced Appraisal entities (who have not yet appeared), each cross-defendant now moves to

dismiss the claims against them.[5]

## II. DISCUSSION

### A.      Statute of Limitations

As a preliminary matter, several cross-defendants argue that all of cross-plaintiffs' claims

are time-barred, citing to a representation made by Hasan Merchant in an affidavit earlier in this

litigation noting that Merchant learned that his properties were improperly appraised from a

---

[4] Daddano pled guilty to federal tax evasion in 2016 and was sentenced to 30 months of imprisonment, which he will begin serving when he completes two consecutive six year state court sentences he received following a convictions for aggravated DUI in Illinois and another consecutive six month sentence for a similar offense in Wisconsin. See *United States v. Daddano*, No. 15 CR 176 (N.D. Ill.), Updated Presentence Investigation Report, ECF 41, at ¶¶ 41-43; Amended Plea Agreement, ECF No. 44 (Aug. 8, 2016), at ¶¶ 6, 9.c.iv - vi; Sentencing Order, ECF No. 54.

[5] In view of its conclusion that the SACC fails to adequately allege violations of RICO, and that the equitable subordination count against the FDIC should be dismissed, the court has considered whether it is appropriate to address the remaining state law claims against the cross defendants. At a minimum, this court has supplemental jurisdiction over those claims pursuant to 28 U.S.C. § 1367, and the court concludes that in light of the age and complexity of this litigation, and the interrelationship between the RICO and state law theories, and the possibility that the cross plaintiffs will replead their RICO claims, it is appropriate to exercise its supplemental jurisdiction with respect to the state law claims. *See Patel v. Wagha*, 866 F.3d 846, 847 (7th Cir. 2017). Further, the court's jurisdiction over this suit derives from 12 U.S.C. § 1819(b)(2)(A), which states in relevant part that "all suits of a civil nature at common law or in equity to which the Corporation, in any capacity, is a party shall be deemed to arise under the laws of the United States." Most circuit courts construing this language have concluded that it provides original jurisdiction to federal courts over any claims asserted in a suit to which the FDIC is, or was, a party, whether or not those claims would otherwise be sufficient to confer jurisdiction on the court. *See Lindley v. FDIC*, 733 F.3d 1043, 1055-59 (11th Cir. 2013) (citing cases and holding that "when the FDIC is a party to a civil suit and removes that case to federal court, the District Court has original jurisdiction over claims against non-FDIC defendants, and this jurisdiction is not lost if the FDIC is later dismissed from the case"). If that is correct, this court has original jurisdiction over the remaining state law claims and lacks the discretion not to decide them. *See id.* (reversing district court's dismissal of state law claims, which was based on court's assumption that jurisdiction over those claims was based on 28 U.S.C. § 1367 rather than on 12 U.S.C. § 1819(b)(2)).

subsequent appraisal dated April 28, 2009, almost six years before Merchant filed the initial cross-complaint in this case (on March 24, 2015). *See* Declaration of Hasan Merchant ¶ 31, Dkt. 117-11. Because the statute of limitations is an affirmative defense, however, the court may only dismiss a claim at the pleadings stage on statute of limitations grounds if "the allegations of the complaint itself set forth everything necessary" to conclude that the claim is time-barred. *Chicago Bldg. Design, P.C. v. Mongolian House, Inc.*, 770 F.3d 610, 613-14 (7th Cir. 2014). If Merchant knew of the fraudulent appraisal in April 2009, the statute of limitations might indeed pose a problem, but the affidavit referenced by cross-defendants merely notes that the appraisal at issue—which was not conducted concomitant to a transaction cross-plaintiffs were involved in, but instead concerned a subsequent transaction involving the same properties—was dated April 28, 2009; it does not indicate that Merchant, or any other cross-plaintiff, received or would have had any reason to receive the appraisal on that day. Because it is not clear at what point Merchant learned of the fraudulent April 2009 appraisal, the court cannot conclude, at this stage, that cross-plaintiffs' claims are "indisputably time-barred." *Small v. Chao*, 398 F.3d 894, 898 (7th Cir. 2005).

Wolin and Rosen also argues that Illinois' six-year statute of repose for claims arising out of an act or omission in the performance of legal services, 735 ILCS 5/13-214.3(c), bars cross-plaintiffs' claims against it. In Wolin and Rosen's view, because the allegedly fraudulent appraisals were conducted over six years before cross-plaintiffs filed their first complaint, cross-plaintiffs' claims against it should be dismissed. The problem with this argument is that cross-plaintiffs' claims are based not only on the initial appraisals, but also on subsequent—and undated—enforcement and collection actions allegedly taken by Wolin and Rosen. Once more,

the court cannot conclude from the pleadings that cross-plaintiffs' claims against Wolin and Rosen are indisputably time-barred.

**B.     RICO Claims**

Cross-plaintiffs assert that each cross defendant (except the FDIC) violated the RICO statute in three ways. They first allege that the defendants violated 18 U.S.C. § 1962(c), which makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c). Cross-plaintiffs also contend that the cross defendants reinvested funds obtained by the enterprise into the enterprise, in violation of 18 U.S.C. § 1962(a). They also charge that all of the cross defendants conspired together to pursue the alleged scheme, violating 18 U.S.C. § 1962(d). A violation of 18 U.S.C. § 1962(d) is contingent on an agreement to "participate in an endeavor which, if completed, would satisfy all of the elements of a substantive violation of the substantive [RICO] statute." *Goren v. New Vision Int'l, Inc.*, 156 F.3d 721, 732 (7th Cir. 1998).

 To state a RICO claim, a plaintiff must (among other things) identify an "enterprise." *United Food and Comm. Workers Unions and Employers Midwest Health Benefits Fund v. Walgreen Co.*, 719 F.3d 849, 853 (7th Cir. 2013). An "enterprise" includes "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity," and is broadly defined. *Id*. (citing *Boyle v. United States*, 553 U.S. 938, 944 (2009)). The type of enterprise alleged by cross-plaintiffs, an "association-in-fact," does not "require any structural features beyond 'a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to

pursue the enterprise's purposes.'" *Bible v. United Student Aid Funds*, 799 F.3d 633, 655 (7th Cir. 2015) (quoting *Boyle*, 556 U.S. at 946). "Despite the expansive nature of this definition, it is not limitless." *Walgreen*, 719 F.3d at 853. And critically, § 1962(c) also requires plaintiffs to identify a "person" that is distinct from the RICO enterprise, and that "person" must have "conducted or participated in the enterprise's affairs, not just its own affairs." *Id.* at 854. Where, as here, the plaintiffs allege that the RICO enterprise was an association-in-fact among various businesses and individuals, it is not enough to allege that a defendant was part of the enterprise; they must plausibly allege that a defendant conducted the affairs of the enterprise, not just its own. *Jay E. Hayden Foundation v. First Neighbor Bank, N.A.*, 610 F.l3d 382, 389 (7th Cir. 2010) (affirming dismissal of RICO complaint because "defendants did not use the conspiracy (the enterprise); they were the conspiracy.").

As set forth in the cross complaint, the defendants each participated in a scheme to profit by continuously defrauding hotel purchasers using Daddono's appraisals and taking aggressive collection actions when the hotels inevitably could not sustain the loans used to purchase them. The parties debate whether the complaint adequately alleges the prerequisites to a RICO association-in-fact enterprise, but for purposes of this opinion the court will assume that it does. The principal problem with the cross-plaintiffs' invocation of RICO is not that they have failed to allege that the putative association-in-fact enterprise did not have a purpose, or that there were no relationships among the component entities of the enterprise, or that the alleged conduct did not continue for a sufficient period to support a contention that it was engaged in a pattern of racketeering activity. *Id.* at 388-89. The principal problem is that the allegations of the complaint fail to plausibly allege that the cross defendants were conducting the affairs of this alleged enterprise rather than simply pursuing their own individual affairs and interests. That is, it fails to

allege facts sufficient to permit a plausible inference that the cross defendants used the enterprise itself to carry out the object of their alleged scheme. *Id.* at 389.

Cross-plaintiffs maintain that the interactions between cross-defendants and other entities and individuals since 2003 establish that the cross-defendants were working jointly together to carry out the purpose of the alleged association-in-fact enterprise. As the cross-plaintiffs frame it in the complaint, the alleged enterprise had multiple "tiers," or participants, each of which was critical to the success of the overall scheme. The first such tier, the complaint alleges, involved Hiren Patel, Edward Fitzgerald, NRB, and Daddono and the Advanced Appraisal entities, who allegedly joined forces to defraud hotel and motel purchasers. The second involved State Bank of Texas, Chandrakant Patel, and non-parties TPG Capital, and Capital Crossing, who purchased NRB's loans after NRB failed. The third tier of the enterprise included Wolin and Rosen and SmithAmundsen, who were hired to collect outstanding payments on the allegedly fraudulent loans and whole filed thousands of lawsuits in support of that effort. But even assuming that the interactions ascribed to the participants in each of these so-called "tiers" were as alleged, they do not suffice to plausibly infer that the participants were seeking to use and promote a distinct enterprise with its own objectives, as opposed to simply conducting their own affairs and pursuing their own individual interests (whether legitimate or illegitimate).

### 1. NRB and Daddono

The allegations pertaining to Daddono in the complaint are essentially that NRB repeatedly paid Daddono excessive rates, and in exchange, Daddono delivered appraisals valuing the properties in question at an inflated rate pre-determined by NRB. These allegations are insufficient to establish that NRB and Daddono conducted the affairs of an association-in-fact enterprise. In *Walgreen*, the Seventh Circuit considered a relationship between Walgreens and

11

Par Pharmaceuticals, in which Par persuaded Walgreens to systematically fill certain prescriptions with the most expensive form of the prescribed drug (capsules or tablets, depending on the drug), even if the prescription called for the less expensive form. Notwithstanding extensive communication between Walgreens and Par—which were alleged to include presentations by Par highlighting the millions of dollars of profits to be earned by engaging in the prescription-switching scheme—the court of appeals concluded that the complaint failed to plausibly allege "that Walgreens and Par were conducting the affairs of this [alleged enterprise], as opposed to their own affairs." Because the complaint did not allege that "officials from either company involved themselves in the affairs of the other" and because "nothing in the complaint reveal[ed] how one might infer that [Par and Walgreens's] communications or actions were undertaken on behalf of the enterprise as opposed to on behalf of Walgreens and Par in their individual capacities," the court concluded that the complaint failed to adequately allege that Par and Walgreens engaged in conduct that used or promoted the alleged enterprise rather than merely alleging conduct that was entirely consistent with the individual interests of each actor rather than the interests of a distinct entity—the enterprise. *See also, e.g., Jay E. Hayden Foundation*, 610 F.3d at 389 (holding that, while plaintiffs had adequately alleged a RICO enterprise comprised of an attorney-executor, a bank, two law firms and various principals of those entities, they had failed to allege that in defrauding the plaintiffs the defendants had conducted or participated in the affairs of the alleged enterprise rather than simply pursuing their own affairs).

So too here. There are no indications that Daddono conducted the affairs of NRB or vice versa; instead, the allegations are merely that NRB paid Daddono to perform an illegal service. True, one can infer from the complaint, based on the repeated nature of the behavior described,

that Daddono knew that NRB was using the false appraisals to defraud hotel purchasers and continued to supply false appraisals nonetheless. Daddono, therefore, had a shared purpose to continue the fraud scheme because he would continue to be paid for appraisals as long as it was active. The problem for cross-plaintiffs, however, is that this was precisely the nature of the relationship at issue in *Walgreen*: it was alleged there that Par induced Walgreens to implement a system that would defraud customers, insurance companies, and the government, and then continuously sold products integral to the fraud to Walgreens. Like Daddono here, Par was alleged to have an incentive to continue enabling Walgreens' fraud by continuing to sell Walgreens the necessary drugs, and did just that. But as the Seventh Circuit explained, that amounted to nothing more than the "sheer possibility" that Walgreens and Par "were acting in concert on behalf of a shadow enterprise while maintaining the outward appearance of a normal commercial relationship." *Walgreen*, 719 F.3d at 855. Par allegedly sold drugs it knew was being used to perpetrate a fraud; Daddono is alleged to have sold appraisals for much the same reason. If Par did not conduct the affairs of an association in fact, neither did Daddono.

That Daddono's conduct was likely unlawful or tortious does not matter. The *Walgreen* court considered the possibility that Par's conduct was independently tortious, and noted that "[a] corporation, after all, is perfectly capable of breaking the law on its own behalf. . . . RICO does not penalize parallel, uncoordinated fraud." *Id*. Cross-plaintiffs "cannot bootstrap [their] allegations of illegal conduct into allegations that [cross-defendants] conducted the affairs of an enterprise by asking [the court] to infer that because the activities were illegal, they therefore must also have been coordinated activity undertaken on behalf of" a separate enterprise. *Id*. Moreover, for an entity to be part of an enterprise, the entity must have "participated in the operation or management of the enterprise" and "played some part in directing the enterprise's

affairs." *Goren*, 156 F.3d at 728. "[M]ere participation in the activities of the enterprise is insufficient." *Id*. The complaint contains no allegations that Daddono or his companies directed any activity; they were simply paid for a service—albeit one that was allegedly tortious—and provided that service. Those allegations undermine, rather than support, an inference that the relationship between NRB and its directors and Daddono and his companies constituted an association-in-fact.

Nor is it of any moment that Daddono produced appraisals according to NRB's instructions. *Bachman v. Bear, Stearns & Co.*, 178 F.3d 930 (7th Cir. 1999) is instructive on this point. There, Bear Stearns was hired by a company to determine the fair market value of a former employee's stock in the company, which the company was entitled to buy back from the employee after he was terminated. *Id*. at 931. The company allegedly directed Bear Stearns to fraudulently undervalue the employee's stock, and Bear Stearns complied, intentionally misrepresenting the stock's value numerous times, over the course of several years, in 66 mail or wire communications. The Seventh Circuit determined that Bear Stearns "cannot be thought to have been conducting, or to have agreed to conduct, the affairs" of an enterprise because Bear Stearns did not "exercise . . . at least some measure of control" over the other entities involved in the alleged enterprise. *Id*. at 932. Daddono's conduct here was virtually identical to that of Bear Stearns: he intentionally and repeatedly produced false appraisals at the instruction of another party. Under *Bachman*, without more, there is no association in fact.

The *Bachman* court ultimately concluded that Bear Stearns "was merely a hireling, as is shown by the fact that the only fee it received was its normal fee for determining a client's fair market value." *Id*. at 933. True, here, the complaint alleges that Daddono received excessive pay in exchange for the fraudulent appraisals. But the allegations here, that Daddono was paid

excessive fees in exchange for his services, do not cure the central deficiency identified in *Bachman*: there were no allegations that Bear Stearns ever exerted any degree of control over an entity other than itself. Like Bear Stearns, Daddono was a mere hireling of NRB. And the relationship between an entity and its hireling does not create an association-in-fact.[6]

Finally, it is worth noting that cross-plaintiffs have alleged an association-in-fact consisting of myriad individuals and entities. They have not alleged or argued that NRB alone was the RICO enterprise, and that the other entities, including Daddono, conspired together to use NRB to perpetrate a fraud in a way that would render the other entities liable under 18 U.S.C. § 1962(d). Because that scenario has not been alleged, the court need not consider it. What has been alleged is that NRB, its officers, and Daddono comprised the principal "tier" of an association-in-fact enterprise, but there are no allegations that permit a plausible inference that, in carrying out the alleged scheme to profit from fraudulent appraisals, those cross defendants were conducting the affairs of a distinct enterprise rather than pursuing their own individual interests and objectives.

### 2.      State Bank of Texas, TPG Capital, and Capital Crossing

The allegations concerning the relationship and interactions between State Bank of Texas, TPG Capital, and Capital Crossing on the one hand, and NRB on the other, come closer to the mark, but are also wanting. State Bank of Texas and Chan Patel argue that SBT acted independently from NRB, as any typical bank or lender would: it purchased, made, serviced, and collected loans, and therefore engaged in typical commercial activity. But that is not quite the case. The complaint contains two allegations that suggest that SBT, TPG, and Capital Crossing

---

[6] Nor can NRB, Hiren Patel, and Fitzgerald form an enterprise, as "an employer and its employees cannot constitute a RICO enterprise." *Fitzgerald v. Chrysler Corp.*, 116 F.3d 225, 226 (7th Cir. 1997).

managed an enterprise including NRB, Fitzgerald, and Hiren Patel. First, the complaint notes that Hiren Patel and Fitzgerald "had contacts and communications" with SBT, TPG, Capital Crossing, and their employees "to arrange the continuation of the fraud scheme and profit-sharing among members," and "to arrange the transfer of illegal profits and revenue after the bank failed." SAC ¶ 43. Second, the complaint alleges that SBT, TPG, and Capital Crossing "agreed to keep track of the extra costs that cannot be carried on the books, such as extra compensation to William Daddono and his appraisers to produce new false appraisals, [and] excessive compensation to the attorneys for preparation of the fraudulent loan documents." *Id*. ¶ 103.

These allegations—which are the only allegations in the complaint describing interactions between SBT, TPG Capital, or Capital Crossing and NRB or its employees for the purposes of defrauding hotel purchasers—are, however, insufficient to establish the existence of a RICO enterprise. As an initial matter, the allegations that SBT, TPG, and Capital Crossing "had contacts and communications . . . to arrange the continuation of the fraud scheme and . . . to arrange the transfer of illegal profits and revenue" amount to little more than boilerplate allegations of an enterprise, adding virtually no factual support to the complaint. *See Goren*, 156 F.3d at 727 ("It is not enough, however, for a plaintiff simply to allege [RICO] elements in boilerplate fashion; instead, she must allege sufficient facts to support each element."). The complaint provides no detail concerning which individuals participated in those communications, what the substance of those communications was, and when and where those communications took place. In essence, the allegations are the rough equivalent of a pleading indicating that SBT, TPG, and Capital Crossing "directed the enterprise's affairs by continuing the fraud scheme and profiting." Such a bare bones pleading does not suffice, even under the less restrictive confines

of Rule 8, much less the heightened requirements for pleading fraud under Rule 9(b)—and the allegations of the RICO counts, predicated on alleged mail and wire fraud schemes, plainly sound in fraud. *See Sabrina Roppo v. Travelers Commercial Ins. Co*., 869 F.3d 568, 592 (7th Cir. 2017) ("Allegations of fraud in a RICO complaint are subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b). A RICO plaintiff must, at a minimum, describe the predicate acts of fraud with some specificity and state the time, place, and content of the alleged communications perpetrating the fraud.") (internal citations and quotation marks omitted).

Nor are the allegations that SBT, TPG, and Capital Crossing "agreed to keep track of the extra costs that [could not] be carried on the books" sufficient to plead a RICO enterprise. First, the complaint does not indicate with whom SBT, TPG, and Capital Crossing agreed to keep track of the extra costs required to pay Daddono and others, or when such agreement occurred. The complaint contains no facts from which it can be inferred that SBT, TPG, and Capital Crossing worked with NRB to make excessive payments to Daddono and others. This is especially true in light of the complaint's allegations that SBT, TPG, and Capital Crossing "obtained fraudulent appraisals" from Daddono and "arrang[ed] the writing of new loan packages" based on Daddono's fraudulent appraisals. SAC ¶ 92. Were SBT, TPG, and Capital Crossing keeping track of payments to Daddono on NRB's behalf, or were they separately tracking payments to Daddono because they were also using his fraudulent appraisals in support of new loans and their collection efforts? The complaint fails to answer that question because, as previously noted, the complaint only speaks of SBT, TPG, and Capital Crossing's communications with NRB, Hiren

Patel, and Fitzgerald in boilerplate fashion.[7] While the former answer is **possible**, the complaint simply lacks allegations that permit an inference that make it **plausible** to infer that these cross defendants were promoting and conducting an enterprise distinct from their own businesses.

Moreover, even assuming that SBT, TPG, and Capital Crossing agreed to make payments to Daddono on NRB's behalf, there are still no allegations in the complaint permitting the inference that SBT, TPG, and Capital Crossing exercised "at least some measure of control" over NRB. *Bachman*, 178 F.3d at 932. Once again, merely participating in a fraud cannot be equated with being a member of a RICO enterprise. The latter requires that SBT, TPG, and Capital Crossing have "played some part in directing the enterprise's affairs." *Goren*, 156 F.3d at 728. The complaint is devoid of such allegations. Without any substantive factual allegations establishing how SBT, TPG, and Capital Crossing colluded with NRB, Hiren Patel, and Fitzgerald, all the court is left with is a parallel fraud precisely like that alleged in *Walgreen*: SBT, TPG, and Capital Crossing merely engaged in standard—albeit fraudulent—banking activities, seeking to profit off of NRB and Daddono's fraud by developing new loan packages and initiating collection actions. But absent more robust factual allegations tethering SBT, TPG, and Capital Crossing to NRB and its employees, the court cannot conclude that those entities conducted the affairs of a RICO enterprise.

### 3.     SmithAmundsen and Wolin and Rosen

Finally, there are no allegations that SmithAmundsen or Wolin and Rosen ever directed an enterprise's activities. The allegations against SmithAmundsen and Wolin and Rosen are

---

[7] Further, the complaint contains no allegations that SBT ever colluded with TPG or Capital Crossing after SBT and TPG purchased NRB's assets; it alleges only that SBT, TPG, and Capital Crossing engaged in the parallel behaviors calculated to defraud borrowers. The court need not assess whether TPG and Capital Crossing separately formed a RICO enterprise because they are not named as cross-defendants.

simply that they performed routine legal services—including preparing loan documents and initiating collection actions against borrowers—knowing that the loans were based on fraudulent appraisals. There are no allegations, however, that either SmithAmundsen or Wolin and Rosen were anything more than hirelings paid to perform legal work on behalf of NRB, STB, TPG, or Capital Crossing. The allegations, therefore, fail to state a RICO claim against the law firms. *See Guaranteed Rate, Inc. v. Barr*, 912 F. Supp. 2d at 688 (N.D. Ill. 2012) (holding that an attorney whose "role in the alleged enterprise was to . . . perform[] the services of a closing attorney on behalf of the seller [of a property]" was a "mere hireling" who did not "direct[], control[], or conduct[] any aspect of the alleged enterprise").

In short, the complaint is wholly devoid of allegations that any of the cross defendants were conducting the affairs of the alleged association-in-fact enterprise rather than pursuing their own affairs. As such, the allegations fall short of plausibly establishing liability under either § 1962(a), (c), or (d). Both subsections (a) and (c) require evidence that defendants conducted the affairs of an enterprise, *see RJR Nabisco, Inc. v. European Community*, 136 S. Ct. 2090, 2105 (2016), and just as there are no allegations that the cross defendants conducted the affairs of the alleged association-in-fact enterprise, there are no allegations that they agreed to do so. *See Walgreen*, 719 F.3d at 856-57 (failure to allege that defendants conducted the affairs of an enterprise also fatal to RICO conspiracy claim in absence of allegations that defendants agreed to do so). Accordingly, the RICO counts are dismissed without prejudice.

### C.     Fraud

With the exception of Hiren Patel, each defendant argues that cross-plaintiffs have failed to substantively state a claim for fraud. Under Illinois law, the elements of a fraudulent misrepresentation claim are: (1) a false statement of material fact; (2) known or believed to be

false by the party making it; (3) intent to induce the other party to act; (4) action by the other party in reliance on the truth of the statement; and (5) damage to the other party resulting from that reliance. *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 569 (7th Cir. 2012).

With the exception of Hiren Patel, cross-plaintiffs do not allege that any of the cross-defendants at issue made any representations to them. The allegations specific to cross-plaintiffs repeatedly note that NRB and Hiren Patel presented cross-plaintiffs with Daddono's fraudulent appraisals for three properties, and that cross-plaintiffs relied on those appraisals in purchasing the properties. SACC ¶¶ 54-66. The cross-plaintiff-specific allegations never, however, mention Fitzgerald, SBT, Chandrakant Patel, SmithAmundsen, or Wolin and Rosen. Nor are general allegations that these cross-defendants conspired with Hiren Patel and NRB to defraud cross-plaintiffs adequate. Federal Rule of Civil Procedure 9 requires fraud to be pled with particularity, *i.e.*, cross-plaintiffs must plead the "who, what, when, where, and how" of the alleged fraud. *Wigod*, 673 F.3d at 569. Cross-plaintiffs have not pled any facts indicating that Fitzgerald, SBT, Chandrakant Patel, SmithAmundsen, or Wolin and Rosen ever communicated with NRB or Hiren Patel about the appraisals they specifically relied upon, or about the sale of hotel properties to cross-plaintiffs. Instead, cross-plaintiffs provide only general allegations of a conspiracy that fail to reveal the what, when, where, or why of any communications related to cross-plaintiffs. The fraud claims against Fitzgerald, SBT, Chandrakant Patel, SmithAmundsen, and Wolin and Rosen are therefore also dismissed without prejudice.

### D.    Breach of Fiduciary Duty

Next, Hiren Patel and Edward Fitzgerald move to dismiss cross-plaintiffs' breach of fiduciary duty claims against them. To state a breach of fiduciary duty claim under Illinois law, a plaintiff must allege that (1) a fiduciary duty exists; (2) the fiduciary duty was breached; and (3)

the breach proximately caused the injury of which the plaintiff complains. *nClosures Inc. v. Block and Co., Inc.*, 770 F.3d 598, 603 (7th Cir. 2014). "A fiduciary duty may be established through relationships such as partnerships and joint ventures, as well as special relationships." *Id.* The typical relationship between a lender and a borrower does not create a fiduciary duty. *Singletary v. Continental Ill. Nat. Bank and Trust Co. of Chicago*, 9 F.3d 1236, 1241 (7th Cir. 1993) (under Illinois law, "a lender is not his borrower's fiduciary."). Consequently, to the extent cross-plaintiffs maintain their breach of fiduciary duty claims based on their lender-borrower relationship between Hiren Patel and Edward Fitzgerald, their claims must be dismissed.

Cross-plaintiffs argue that Hiren Patel and Fitzgerald owed them duties not as their lender, but as their escrowee with regard to the hotel transactions. Under Illinois law, an escrowee "owes a fiduciary duty to act only in accordance with the terms of the escrow instructions." *Freedom Mortgage Corp. v. Burnham Mortgage Corp.*, 720 F. Supp. 2d 978, 997-98 (N.D. Ill. 2010). In cross-plaintiffs' view, because NRB transferred funds from the closing escrow account for the three properties in question and the underlying property sales were based on fraudulent appraisals, they have stated a claim against Hiren Patel and Fitzgerald for breach of fiduciary duty. As an initial matter, however, there are no allegations that Edward Fitzgerald had anything to do with cross-plaintiffs' hotel purchases; the complaint alleges only that Hiren Patel and NRB transferred down payment money out of the closing escrow accounts. SACC ¶¶ 57, 61, 66. As for Hiren Patel, "[a]ny duty owed to [cross-plaintiffs] in [his] capacity as closing agent[] must derive from the closing instructions, and not generally from law and industry standards." *Freedom Mortgage*, 720 F. Supp. 2d at 991 (quoting *Bescor, Inc v. Chicago Title & Trust Co.*, 113 Ill. App. 3d 65, 69, 446 N.E.2d 1209, 1213 (Ill. App. Ct. 1983)). The complaint does not allege any facts concerning closing instructions for the hotel transactions at issue, nor does it

explain how Hiren Patel breached any closing instructions. Cross-plaintiffs' breach of fiduciary duty claims are therefore dismissed without prejudice.

### E.    Negligence

Hiren Patel and Fitzgerald also move to dismiss cross-plaintiffs' negligence claims, arguing that they are barred by Illinois' *Moorman* doctrine, which holds that a plaintiff may not recover in tort for solely economic losses. *See generally Moorman Mfg. Co. v. National Tank Co.*, 91 Ill.2d 69, 435 N.E.2d 443 (Ill. 1982). Under the *Moorman* rule, an entity may not recover on a negligence theory for "injuries suffered as a result of disappointed commercial expectations." *Waldinger Corp v. CRS Group Engineers, Inc.*, 775 F.2d 781 (7th Cir. 1985). Cross-plaintiffs assert that the *Moorman* rule does not apply because, in addition to economic damages, they are also seeking compensation for mental stress, psychological damage, degradation, humiliation, embarrassment, and anxiety. Although cross-plaintiffs are correct that emotional distress damages are noneconomic, Illinois prohibits direct victims of alleged negligence—or the entity that was directly affected by the alleged negligence—from recovering for emotional distress absent a contemporaneous physical injury. *See Hart v. Amazon.com, Inc.*, 191 F. Supp. 3d 809, 821-22 (N.D. Ill. 2016) (citing *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 703 (7th Cir. 2009)). Cross-plaintiffs allege that they were the direct victims of Hiren Patel's and Fitzgerald's negligence, but fail to allege any physical injury. *See id.* (holding that allegations of sleep disruption, mental anguish, depression, and anxiety are insufficient to establish a physical injury).[8] Consequently, their negligence claims against Hiren Patel and Fitzgerald are dismissed with prejudice.

---

[8] There is an "information provider" exception to the *Moorman* doctrine that permits tort recovery for economic damages where a defendant whose job is to provide information to another—like an appraiser—intentionally or negligently provides false information. *See First*

### F.    Tortious Interference with Contract

All cross-defendants (except the FDIC, which was not named in this count) maintain that cross-plaintiffs have failed to state a viable claim based on tortious interference with contract. Under Illinois law, to state a claim for tortious interference with contract, cross-plaintiffs must allege: (1) the existence of a valid and enforceable contract between the plaintiff and another; (2) the defendant's awareness of this contractual relation; (3) the defendant's intentional and unjustified inducement of a breach of the contract; (4) a subsequent breach by the other, caused by the defendant's wrongful conduct; and (5) damages. *Healy v. Metropolitan Pier and Exposition Authority*, 804 F.3d 836, 841-42 (7th Cir. 2015). Cross-defendants argue that the complaint does not identify the terms of any contract or include any facts indicating how a contract was breached. Cross-plaintiffs respond by pointing to paragraphs in the complaint that indicate that they had a "reasonable expectation of capital returns, income, dividends, equity increases, increases in value of shares, and other pecuniary gains" from operating and shareholder agreements pertaining to their hotel purchases. SACC Ct. 7 ¶¶ 4-5. But these paragraphs merely note that cross-plaintiffs expected to profit from these contracts and failed to do so. Cross-defendants are correct that the complaint fails to identify any terms of the operating and shareholder agreements, and therefore also fails to identify who breached the terms of the agreements and how they did so. Indeed, the complaint fails to even identify who the parties to the operating and shareholder agreements were. The failure to identify a breach requires dismissal, without prejudice, of cross-plaintiffs' tortious interference with contract count. *See, e.g., Cromeens, Holloman, Sibert, Inc. v. AB Vovo*, 349 F.3d 376, 398 (7th Cir. 2003) (rejecting a

---

*Midwest Bank, N.A. v. Stewart Title Guar. Co.*, 218 Ill.2d 326, 335-36, 843 N.E.2d 327, 332-33 (Ill. 2006). Cross-plaintiffs have not argued, however, and it would not appear in any event, that this exception applies to Hiren Patel or Fitzgerald.

tortious interference with contract claim where the plaintiffs had "not presented any evidence that [any entity] breached already-existing agreements because of [the defendant's] conduct").

### G. Quantum Meruit

All cross-defendants also move to dismiss cross-plaintiffs' quantum meruit count. Under Illinois law, "[t]he elements of quantum meruit liability . . . are the performance of services by the plaintiff, the receipt of the benefit of those services by the defendant, and the unjustness of the defendant's retention of that benefit without compensating the plaintiff." *Midcoast Aviation, Inc. v. Gen. Elec. Credit Corp.*, 907 F.2d 732, 737 (7th Cir. 1990). Cross-defendants argue that cross-plaintiffs have not alleged that they provided a service to cross-defendants. Cross-plaintiffs respond that cross-plaintiffs suffered property losses and loss of management fees as a result of cross-defendants' actions, and that they provided a "service" to cross-defendants when they made debt service payments on loans they took out from NRB. Debt service payments, however, are not the type of "service" contemplated by the law of quantum meruit, which permits recovery for parties who have performed labor for another's benefit without compensation. *See, e.g., Goyal v. Gas Tech. Institute*, 718 F.3d 713, 719 (7th Cir. 2013) (holding that under Illinois law, attorneys may "recover on a quantum meruit basis a reasonable fee for services rendered before discharge"); *Midcoast Aviation*, 907 F.2d at 739 (holding that a subcontractor could recover under a quantum meruit theory for work performed improving the interior of airplanes). Cross-plaintiffs have not cited—and the court has been unable to locate—a single case applying Illinois law where a court has considered debt repayment to be a "service" for which a party can recover on a quantum meruit theory. Cross-plaintiffs' quantum meruit count is therefore dismissed with prejudice.

### H. Equitable Subordination

Finally, the FDIC moves to dismiss cross-plaintiffs' equitable subordination count, arguing that this court does not have jurisdiction to entertain it because cross-plaintiffs failed to present it to the FDIC before filing suit. Under the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (FIRREA), "the FDIC has statutory authority to administer claims against a depository institution for which the FDIC is receiver." *Farnik v. F.D.I.C.*, 707 F.3d 717, 720-21 (7th Cir. 2013). Except as otherwise provided in FIRREA, "no court shall have jurisdiction over . . . any action seeking a determination of rights with respect to[] the assets of any depository institution for which the [FDIC] has been appointed receiver, including assets which the [FDIC] may acquire from itself as such receiver; or . . . any claim relating to any act or omission of such institution or the [FDIC] as receiver." 12 U.S.C. § 1821(d)(13)(D). FIRREA permits "judicial review of claims that have exhausted [the FDIC's] administrative claim procedure." *Farnik*, 707 F.3d at 721 (citing 12 U.S.C. § 1821(d)(6)(A)). "The party asserting federal jurisdiction bears the burden of demonstrating its existence." *Id.*

The FDIC contends that cross-plaintiffs never pursued their equitable subordination theory in the FDIC's administrative claim process, and therefore maintains that this court does not have jurisdiction to adjudicate it. Cross-plaintiffs respond that they may pursue any legal theory so long as the facts underlying it were presented to the FDIC. Alternatively, cross-plaintiffs maintain that their presentation of an unjust enrichment theory to the FDIC sufficed to exhaust administrative remedies as to their present equitable subordination count.

Neither of cross-plaintiffs' arguments are availing. First, under FIRREA, the legal theory that a plaintiff wishes to pursue—and not merely the facts underlying the theory—must be presented to the FDIC. Even the case cited by cross-plaintiffs recognizes this: under FIRREA,

"FDIC is entitled to fair notice of the facts and legal theories on which a claimant seeks relief from the failed institution." *Ravenswood, LLC v. F.C.I.C.*, No. 10–cv–1064, 2011 WL 1079495, at *4 (N.D. Ill. Mar. 21, 2011); *see also Farnik*, 703 F.3d at 721 ("Courts lack jurisdiction to hear such claims unless plaintiffs first present them to the FDIC."). Indeed, permitting parties to pursue in court any legal theory based on underlying facts presented to the FDIC would defeat the purpose of FIRREA's exhaustion requirement, which is to give the FDIC "a fair opportunity to determine whether it is in fact obligated to pay [plaintiffs] before being hauled into court." *Ravenswood*, 2011 WL 1079495, at *4 (citing *Brown Leasing Co. v. F.D.I.C.*, 833 F. Supp. 672, 675 (N.D. Ill. 1993)).

Second, cross-plaintiffs' presentation of an unjust enrichment theory before the FDIC does not suffice to exhaust their equitable subordination count. Unjust enrichment and equitable subordination are two separate legal theories arising under different bodies of law. Unjust enrichment is a creature of state common law; by contrast, equitable subordination is a federal statutory theory arising out of the United States Bankruptcy Code. *See Paul H. Schwendener, Inc. v. Jupiter Elec. Co.*, 358 Ill. App. 3d 65, 72, 829 N.E.2d 818, 828 (Ill. App. Ct. 2005) ("As equitable subordination is a federal statutory creation available only in bankruptcy proceedings, we agree with the trial court's determination that no such cause of action is recognized in Illinois."). Although equity underpins both unjust enrichment and equitable subordination, an assessment of whether an entity is entitled to relief for unjust enrichment would not necessarily be determinative of whether the entity is entitled to a federal equitable subordination remedy, and vice versa. A claim for equitable subordination, for example, requires consistency with the United States Bankruptcy Code, which is obviously not a requirement of common law unjust enrichment. *See id.* ("[E]quitable subordination of the claim must not be inconsistent with the

provisions of the Bankruptcy Code."); *see also In re Kreisler*, 546 F.3d 863, 866 (7th Cir. 2008). Consequently, cross-plaintiffs cannot be said to have presented their equitable subordination theory to the FDIC.

Cross-plaintiffs also contend that because this lawsuit predated the receivership, FIRREA's exhaustion provisions do not apply. Although the Seventh Circuit has not definitively resolved this issue, the available authority indicates that pre-receivership claims must be exhausted before the court can continue to exercise jurisdiction over them. *See Farnik*, 707 F.3d at 722 n.2 ("While there is no Seventh Circuit precedent on this issue, other circuits have interpreted FIRREA as allowing courts to maintain jurisdiction over pre-receivership claims *and* as requiring such claims to go through the administrative claims process through a provision mandating that courts grant requests for stays made by the receiver.") (citing *Marquis v. F.D.I.C.*, 965 F.2d 1148, 1154 (1st Cir. 1992); *Glover v. F.D.I.C.*, 698 F.3d 139, 151 (3d Cir. 2012); *Brady Dev. Co. v. Resolution Trust Corp.*, 14 F.3d 998, 1006 (4th Cir. 1993)); *Brown Leasing*, 833 F. Supp. at 674-75 ("[C]ompliance with FIRREA's procedure is mandatory for all claims whether asserted as part of a pre- or post-receivership lawsuit."). Moreover, this case was stayed for several months in 2015—that is, post-receivership—during which time cross-plaintiffs pursued their claims with the FDIC, which denied them. See Dkt. 27. Because cross-plaintiffs failed, however, to raise their equitable subordination theory with the FDIC, this court lacks jurisdiction to entertain it now, and it is dismissed without prejudice.[9]

\* \* \*

For the foregoing reasons, cross-plaintiffs' RICO, tortious interference with contract, and breach of fiduciary duty counts are dismissed without prejudice as to all moving cross-

---

[9] The FDIC has not argued that cross-plaintiffs will never be able to exhaust their equitable subordination claim, so the court declines to dismiss it with prejudice.

defendants. Cross-plaintiffs' fraud count is dismissed without prejudice as to all moving cross-defendants except Hiren Patel. Cross-plaintiffs' negligence and quantum meruit counts are dismissed with prejudice as to all moving cross-defendants. Cross-plaintiffs' equitable subordination count against the FDIC is dismissed without prejudice.

Dated: January 4, 2018

John J. Tharp, Jr.
United States District Judge